IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MARK MINNIHAN,<br><br>        Plaintiff,<br><br>vs.<br><br>MEDIACOM COMMUNICATIONS<br>CORPORATION,<br><br>        Defendant. | **No. 4:12-cv-00248 – JEG**<br><br><br>**O R D E R** |

This matter comes before the Court on Motion by Defendant Mediacom Communications

Corporation (Mediacom) for Summary Judgment.  Plaintiff Mark Minnihan (Minnihan) resists.

The Court held a hearing on the motion on November 8, 2013.  Attorney Mark Sherinian

appeared on behalf of Minnihan.  Attorneys Emily Pontius and Michael Giudicessi appeared on

behalf of Mediacom.  The matter is fully submitted and ready for disposition.

## I.      JURISDICTION

On June 11, 2012, Mediacom removed this action to federal court asserting federal

question jurisdiction based on Minnihan's claim under the Americans with Disabilities Amend-

ment Act of 2008 (ADAAA), 42 U.S.C. § 12101 et seq.  Notice of Removal ¶ 1, ECF No. 1.

This Court has original jurisdiction over Minnihan's ADAAA claims pursuant to 28 U.S.C. §

1331 and supplemental jurisdiction over Minnihan's state law claims pursuant to 28 U.S.C.

§ 1367.

## II.   BACKGROUND

### A.   Factual Background[1]

Minnihan worked for Mediacom and its predecessors for thirty years and most recently was employed by Mediacom as a technical operations supervisor (TOS) at Mediacom's Ames facility from July 2001 until May 2011.  Minnihan's main responsibilities as a TOS were to supervise and support the technicians assigned to him and respond to customer service needs. As a TOS, Minnihan was issued a Mediacom vehicle to drive to and from work and during the workday so he could respond to cable outages that occurred outside of normal working hours. Minnihan's supervisor at Mediacom between 2008 and 2011 was Tim Adreon (Adreon), who was a technical operations manager (TOM).  Adreon's supervisor during that period of time was Rod Cundy (Cundy), the Director of Technical Operations.  Minnihan was assigned anywhere from thirteen to twenty-three technicians, though the number was closer to twelve or thirteen during the 2008-2011 time period.

Minnihan's medical records indicate that Minnihan experienced seizures on April 20, 2008; August 30, 2008; January 5, 2009; and November 16, 2009; one of which Minnihan's treating physician considered to be a grand mal seizure.  Mediacom avers that Minnihan failed to report any of these seizures to anyone at Mediacom, while Minnihan continued to drive a Mediacom vehicle.  Minnihan asserts that although his "medical records reflect certain incidents, only some of these were actual seizures," and that he did report the incidents that required a driving restriction to Adreon.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶¶ 6A, 6B,

---

[1] The facts set forth are either undisputed or viewed in the light most favorable to Minnihan, the nonmoving party, and afford Minnihan all reasonable inferences.  See O'Neil v. City of Iowa City, Iowa, 496 F.3d 915, 916 n.1 (8th Cir. 2007); Lexicon, Inc. v. ACE Am. Ins. Co., 634 F.3d 423, 425 (8th Cir. 2011) (citing Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 984 (8th Cir. 2009); see also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

ECF No. 18.  His only record support that he informed Mediacom about any of these incidents is from his wife's affidavit.[2]  Mediacom asserts that Minnihan never informed them that he had experienced multiple seizures, some of which may have required a six-month driving restriction under Iowa law.  The relevant provision of Iowa law states that

> The department shall not knowingly license any person who suffers from syncope of any cause, any type of periodic or episodic loss of consciousness, or any paroxysmal disturbances of consciousness, including but not limited to epilepsy, until that person has not had an episode of loss of consciousness or loss of voluntary control for six months, and then only upon a receipt of a medical report favorable toward licensing.

Iowa Code § 600.4(4).

Additionally, Minnihan's medical records for a seizure he experienced in January of 2009 note that he was instructed by his doctors "that as the law states he cannot drive for 6 months," though he could work with the Department of Transportation to try to appeal this restriction due to his medication being switched to a generic option without his knowledge.  McFarland Clinic Med. Records of Jan. 21, 2009, App. 125-126; Pl.'s App. 134, ECF Nos. 15-17, 18-6.  There is no evidence in the record that Minnihan ever contacted the Department of Transportation to see if he qualified for an exemption to the driving restriction.

Minnihan experienced a seizure at work on December 1, 2009, which led to a six-month driving restriction in accordance with Iowa law.  During a visit with his doctor on December 14,

---

[2] Mediacom's Supervisor Safety Manual for the years in question states that "[a]ll 'Drivers' are to notify their Supervisors IMMEDIATELY of any illness, injury or physical condition or use of medication that may impair their ability to drive."  Mediacom Safety Manuals 2008-2011, Def.'s App. 198, ECF No. 15-14.  Minnihan repeatedly gave written acknowledgment of Mediacom's policy requiring employees to report driving violations or health conditions that could adversely affect their ability to safely drive Mediacom's vehicles.  Mediacom's Employee Handbook sets forth the following as examples of extremely serious misconduct that may subject an employee to termination of employment for a first offense: "Misrepresentation or falsification of records, employment application, work orders, time records, or other information used or required by the Company," and "Violation of a safety rule which endangers the life or safety of any employee or others, or the Company's continuation of operation."  Mediacom's Employee Handbook 15, Def.'s App. 330, ECF No. 15-45.

2009, Minnihan brought up his six-month driving restriction telling the doctor he was "very con-
cerned that he might lose his job because part of his job requires driving."  McFarland Clinic
Med. Records of Dec. 14, 2009, Def.'s App. 128-29, ECF No. 15-17.

Following the December 1, 2009, seizure, Mediacom accommodated Minnihan's six-
month driving restriction by shifting any driving responsibilities to other employees at the Ames
facility.  Minnihan testified that his driving responsibilities were already shifted to his assistant
technician, Dave Hutchison (Hutchison), before he received his six-month driving restriction.
Adreon testified that Mediacom accommodated Minnihan during his six-month driving restric-
tion because "I think we all wanted him to get better."  Adreon Dep. 81:4-81:5, Def.'s App. 40,
ECF No. 15-8.  On March 30, 2010, Minnihan experienced another seizure at work, which
started a new six-month driving restriction.

Bobby Gadams (Gadams), a senior manager of Human Resources for Mediacom's west
Iowa region from November 2009 to 2011, was responsible for providing human resources
support for Mediacom's facility in Ames, Iowa.  Senior Director of Human Resources Pamela
Wellman (Wellman), Vice President of Human Resources Judith Mills (Mills), Gadams, and
Steve Purcell had several conversations and unanimously decided that Mediacom would no
longer accommodate Minnihan's driving restriction in the TOS position and would look at
available positions to which Minnihan could be transferred.  In a letter signed by Gadams and
dated May 7, 2010, Mediacom informed Minnihan that it could no longer accommodate
Minnihan in the TOS position because driving and climbing were essential functions of his job.
Mediacom gave Minnihan fourteen days to apply for jobs at Mediacom that did not require
driving or climbing.  Rather than apply for a non-driving job at Mediacom, Minnihan's attorney,
Pam Walker, sent a letter to Mediacom asking for a meeting to start the interactive process to
find an accommodation for Minnihan in his TOS position.

On July 20, 2010, Cundy, Adreon, and Gadams met with Minnihan to discuss non-driving jobs at Mediacom for which he could apply.  They provided Minnihan with a memo and two job descriptions for vacant non-driving positions with similar pay to his TOS position for him to consider, and he was encouraged to apply for any open non-driving positions at Mediacom.  The memo informed Minnihan that if he did not apply for a non-driving position within the company, if he did not accept any position offered, or if he did not participate in good faith in the selection process, his employment would be terminated on July 26, 2010.  Gadams encouraged Minnihan to use company time to inquire about other positions at Mediacom and offered his and Adreon's support.

On July 25, 2010, Minnihan contacted Gadams and told him the two suggested non-driving positions provided to him in the memo from Mediacom were not feasible because they were located in Des Moines.  Minnihan suggested that Mediacom allow him to continue working as a TOS until October 1, 2010, when he would no longer have a driving restriction.  Further, Minnihan asked if he would qualify for leave under the Family Medical Leave Act (FMLA) until October 1, 2010.  Alternatively, Minnihan suggested restructuring his position as a TOS to per-form non-driving tasks.  Mediacom understood this to mean that Minnihan wanted them to create another TOS supervisor position in Ames, whereas Minnihan alleges he was only asking to swap certain duties with another employee who already worked at the Ames office.

Minnihan conceded at his deposition that Mediacom allowed him time during the workday to look for another position at Mediacom and gave him the opportunity to speak with managers who had open positions but that he never seriously considered taking one of the positions because of the transportation issues between Ames and Des Moines.  There were no open positions at the Ames office in 2010 when Minnihan was asked to apply for non-driving jobs at Mediacom.

Mediacom continued to accommodate Minnihan in his TOS position until October of 2010, as it was only a few months away from the date his driving privileges would be reinstated, and he was a long-term valued employee that Mediacom hoped to retain.  Additionally, Mediacom realized that if Minnihan were permitted to take FMLA leave until October of 2010, Mediacom would experience a greater hardship because they could not fill the TOS position and train that individual in an expeditious manner.  Gadams, Wellman, and Mills all participated in the decision to continue accommodating Minnihan in the TOS position until he regained his driver's license in October of 2010.

On October 4, 2010, Minnihan's doctor cleared him to drive, at which time Minnihan was able to resume driving in his capacity as a TOS.  In January and February 2011, Minnihan experienced epileptic "events" but did not report these events to anyone at Mediacom and instead continued to drive his Mediacom vehicle.

Minnihan experienced a seizure at work on April 5, 2011, when he was found on the floor beside his desk by a co-worker.  Minnihan told Adreon that he did not take his anti-seizure medication because it made him tired.  Following this seizure, Minnihan was restricted from driving and also restricted from climbing more than three feet off of the ground until October 5, 2011.

Mediacom's TOS job description states that individuals in that position are "[r]esponsible for directing the work activities of all installers, service technicians and other personnel as assigned," and they are "[r]esponsible for technical training of supervised personnel and for all service activities which contribute to customer satisfaction."  Mediacom's TOS Job Description, Def.'s App. 123, ECF No. 15-16.  The job description also provides a list of specific responsibilities for the TOS position, set forth as follows:

- Performs recruitment, hiring, monitoring, evaluating and disciplining of field personnel.
- Perform all necessary preventative and corrective maintenance functions on cable systems, and fiber optic network.
- Implement quality control checks and monitor safety practices.

- Ensure service, governmental, and franchise requirements are met concerning picture quality, leakage control, and overall integrity of cable plants within area of responsibility.
- Develop and maintain good relations with utilities, general public and governmental agencies.
- Maintain, through inventory procedures, required equipment and material levels by effective planning, ordering and conservation of physical resources, to ensure optimum plant operations.
- Direct required proof of performance testing, signal leakage monitoring and repair program, care, and maintenance of facilities and equipment.
- Prepares reports as required on the operation of the department.
- Maintain an in depth knowledge of all applicable regulations and specifications concerning the repair of the system.
- Act as a liaison between other departments.
- Performs quality control inspections on all field personnel on a regular basis to assure quality and recommend additional training as needed.
- Climb poles with proper equipment (safety belt, safety strap and climbers), ladders or other structures as needed.  Lifts and carries loads up to 70 lbs (including 28 ft ladder); uses bucket truck when required (after receiving certification).  Works within limited confines, such as crawl spaces.
- Perform other duties as required or directed.

Id.  In the "Experience/Skills" section of the job description, it states "[v]alid driver's license with good driving required."  Id.

The TOS position required Minnihan to ensure Quality Checks (QCs) were performed on each of his assigned technicians multiple times per quarter.  When completing QCs, the TOS must go to the job site and inspect the technician's work to determine whether it meets Mediacom's expectations.  Mediacom expects thirteen to fourteen QCs to be done for each technician each quarter.  QCs are done independently by the TOS after the technician has finished the job, and each QC takes approximately fifteen to twenty minutes.  Adreon testified that it is important for a TOS to do QCs for the technicians that TOS supervises so that the TOS can discuss performance issues with each technician using that first-hand knowledge.

Minnihan testified that his QCs were often done by his assistant, Dave Hutchison (Hutchison), before his driver's license was restricted, so that did not change a great deal after he had his seizures.  Hutchison testified that he completed more than 50% of Minnihan's QCs

before Minnihan's driving restriction and that this increased to approximately 80 to 95% of Minnihan's QCs either completed on his own or along with Minnihan after the driving restriction was in place.

A TOS observes technicians doing installations and responds to problem calls by doing "tech ride-alongs."  Adreon Dep., App. 32, ECF No. 15-8.  Mediacom does not consider a QC done during a tech ride-along an acceptable method for completing all QCs because the purpose of the QC is to verify what a technician is doing when the supervisor is not present.  However, Mediacom allowed Minnihan to do QCs while the technician was present on a tech ride-along while Minnihan was restricted from driving.

As a TOS, Minnihan was required to respond to customer complaints, referred to as escalated trouble calls.  Such calls require either a different technician or the supervising TOS to drive to the customer's home to discuss the complaint and, if necessary, fix the technical issue that was not resolved by the original technician.  These calls occurred approximately twice a week.  Minnihan testified that, prior to his driving restriction, he would meet technicians at the customer's home to respond to an escalated trouble call.  After Minnihan's driving was restricted, the technician responding to the call would either need to go alone and work through the problem with Minnihan over the phone if the technician was unable to fix the problem, or Minnihan would have to find a ride to the customer's home to assist in-person.

Mediacom's Supervisor Safety Manual provides that supervisors are responsible for accident investigations.  As a TOS, Minnihan was required to conduct accident investigations when technicians he supervised were involved in an accident.  Adreon testified that he often did Minnihan's investigations before Minnihan's driving restriction because Minnihan did not complete the reports in a timely manner, and he continued conducting the investigations while

Minnihan's driving restriction was in place.[3]  These investigations typically required the supervisor to go to the scene of the accident.

TOSs are required to supervise and support their technicians, which sometimes includes delivering equipment to technicians in the field, and were expected to perform unannounced safety inspections in the field.  They were also required to be on call twenty-four hours a day, seven days a week, to assist technicians with cable outages when necessary.  A TOS could be asked to assist technicians in taking Mediacom vehicles for repairs or service and to assist with Mediacom's FCC requirement of driving the entire physical plant once a year to monitor for signal leakage that could interfere with aeronautical frequencies.  Those duties all required driving, so Minnihan was unable to perform those duties during his driving restriction.

Hutchison testified that during Minnihan's driving restriction, Hutchison drove to customer homes on behalf of Minnihan between six and ten times to take photographs for damage claims.  Additionally, on one occasion, Hutchison said he had to drive Minnihan to an accident scene involving a technician Minnihan supervised.  The only way Minnihan could physically supervise his technicians in the field after his seizures was to have a co-worker or a family member drive him.

When Minnihan was restricted from driving, he relied on other Mediacom employees to respond to outages and to drive him to outages, and he relied on family members to transport him as well.  In her declaration, Mills stated that for liability reasons, Mediacom does not permit employees to rely on family members to transport them to and from cable outages, though Adreon was aware that Minnihan had done this on one occasion while Minnihan's driver's license was restricted.

---

[3] Minnihan received a Corrective Discipline Memorandum on March 11, 2009, for failure to timely submit paperwork related to an accident investigation.

Hutchison testified that he normally worked forty hours a week, but during the period of Minnihan's driving restriction, Hutchison was forced to work over forty hours per week and at least 25% of the Saturdays to catch up on QCs or on his own regular work. Adreon also testified that five or six of those extra hours each week were spent completing functions of Minnihan's TOS position.

After Minnihan's seizure in April of 2011, Gadams and Wellman recommended to Mills that Minnihan be transferred to a non-driving position, the Network Operations Center (NOC) Operator position, that was open at the time in Des Moines. After this offer was communicated to Minnihan, his attorney contacted Gadams on April 14, 2011, and informed him that the NOC Operator position was not a reasonable accommodation because Minnihan's driving restriction would make it difficult for him to get to and from work. Minnihan's attorney did not make any suggestions for alternative accommodation at that time.

On April 15, 2011, Adreon and Gadams informed Minnihan that Mediacom was offering him a transfer to the NOC Operator position in Des Moines. Minnihan was also offered the opportunity to apply for other open positions at Mediacom. Minnihan did not discuss alternative accommodation options, nor did he say anything about the accommodation offered by Mediacom. After the meeting with Adreon and Gadams, Minnihan emailed Wellman on April 15, 2011, acknowledging that Mediacom had granted him "additional days to figure things out" and resolve the issue of finding transportation to Des Moines. April 15, 2011, Minnihan Email, Def.'s App. 156, ECF No. 15-34. Mediacom completed the paperwork to transfer Minnihan from his TOS position to the NOC Operator position in Des Moines in April of 2011. Minnihan asked many questions about the NOC Operator position and had an opportunity to speak to the manager of the department regarding the position.

On April 26, 2011, Minnihan had not reported to his position as a NOC Operator, and Wellman sent a letter with the results of her own research into transportation options, including

identification of another Mediacom employee with whom Minnihan could carpool every morning and a list of seven websites with potential rideshare and public transportation options from Minnihan's residence in Ames to the NOC Operator position in Des Moines.  Wellman also offered that Minnihan could apply for leave under the FMLA and for Short Term Disability benefits, and she included the paperwork for both opportunities with her letter.  Additionally, Wellman stated that Minnihan's schedule as a NOC Operator would be flexible, which would hopefully make it easier for him to find workable transportation options.  Minnihan testified that he did not even consider the NOC Operator position in Des Moines because of transportation issues and the fact that he did not want to relocate to Des Moines.  He also testified that he did not apply for leave under the FMLA.

On April 27, 2011, Minnihan emailed Wellman and suggested ways that Mediacom could keep him in his TOS position in Ames by hiring a second TOS out of the Ames office and restructuring the positions so that Minnihan could continue in his current job in a non-driving capacity.  On April 29, 2011, Wellman replied to Minnihan by email stating that there were no current job openings available for Minnihan in Ames and that Mediacom would not be creating a new position in Ames to accommodate Minnihan's driving restriction.

On May 2, 2011, Mediacom provided Minnihan with notice that his employment would be terminated if he did not report for work in his new NOC Operator position in Des Moines.  On May 16, 2011, Minnihan had still not reported to work to start the NOC Operator position, so Mediacom terminated his employment.  At his deposition, Minnihan acknowledged that the only reason Mediacom terminated his employment was because he could not drive and he did not accept a transfer to the NOC Operator position.

### B.  Procedural Background

After his termination, Minnihan filed a claim with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC) alleging discrimination

under the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216; and the ADAAA, 42 U.S.C. § 12101 et seq.  Minnihan received his right to sue letters from the ICRC and EEOC and filed a petition against Mediacom in the Iowa District Court for Story County on April 12, 2012, alleging violations of the ICRA and ADAAA (ECF No. 1-1).  Mediacom timely removed the action on June 11, 2012.

On August 16, 2013, Mediacom filed this Motion for Summary Judgment arguing it is entitled to summary judgment on all of Minnihan's claims because Minnihan has failed to present a prima facie case that he was qualified to perform the essential functions of his position and that Minnihan's termination was not an adverse action due to a disability.  Minnihan resists arguing driving was not an essential function of the TOS position, Mediacom failed to offer Minnihan a reasonable accommodation or engage in the interactive process in good faith, and Mediacom cannot prove its affirmative defense of undue hardship.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must support its contention by pointing to the record to demonstrate that no genuine issue of material fact exists.  Fed. R. Civ. P. 56(c)(1)(A).  The evidence must be "viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)).

As movant, Mediacom "'bears the initial responsibility of informing the . . . court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'"  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (second and third alteration in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  However, to defeat summary judgment,

Minnihan, the nonmoving party, must "produce sufficient evidence to support a verdict in his favor based on more than speculation, conjecture, or fantasy." Doe v. Dep't of Veterans Affairs, 519 F.3d 456, 460 (8th Cir. 2008) (citation and internal quotation marks omitted). "A party cannot defeat a summary judgment motion by asserting 'the mere existence of *some* alleged factual dispute between the parties'; the party must assert that there is a '*genuine* issue of *material* fact.'" Quinn v. St. Louis Cnty., 653 F.3d 745, 751 (8th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). The fact must be material so that it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.

The grant of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." In re Baycol Prods. Litig., 596 F.3d 884, 888-89 (8th Cir. 2010) (quoting Celotex, 477 U.S. at 322). For the nonmoving party to succeed in defeating the motion, "the evidence must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" Reed v. City of St. Charles, Mo., 561 F.3d 788, 791 (8th Cir. 2009) (quoting Anderson, 477 U.S. at 248).

## B.  Disability Discrimination Claims: ADAAA and ICRA

In ADAAA cases, in the absence of direct evidence of disability discrimination, the Court applies the three-part, burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Torgerson, 643 F.3d at 1044. Under the McDonnell Douglas framework, Minnihan must first establish a prima facie case of disability discrimination. Id. at 1046. Mediacom then bears the burden of production to "articulate a legitimate, nondiscriminatory reason" for terminating Minnihan's employment. Id. (quoting Dixon v. Pulaski Cnty. Special Sch. Dist., 578 F.3d 862, 867-68 (8th Cir. 2009)). If such a reason is articulated, the burden shifts back to Minnihan to show that Mediacom's proffered nondiscriminatory reason is "mere pretext for intentional discrimination," which merges with his "ultimate burden of persuading the

13

court that [he was] the victim of intentional discrimination." Id. (citations and internal quotation marks omitted). At all times, Minnihan bears the ultimate burden of proof and persuasion that Mediacom discriminated against him. Id. "[D]isability claims under the ICRA are generally analyzed in accord with the ADA." Kallail v. Alliant Energy Corp. Servs., Inc., 691 F.3d 925, 930 (8th Cir. 2012) (alteration in original) (quoting Gretillat v. Care Initiatives, 481 F.3d 649, 652 (8th Cir.2007)); Bearshield v. John Morrell & Co., 570 N.W.2d 915, 918 (Iowa 1997).[4]

To meet his prima facie burden of proving disability discrimination under the ADAAA and ICRA, Minnihan must establish that "he was a disabled person within the meaning of the ADA, was qualified to perform the essential functions of his job, and suffered an adverse employment action because of his disability." Finan v. Good Earth Tools, Inc., 565 F.3d 1076, 1079 (8th Cir. 2009).

Mediacom does not contest that Minnihan was disabled for purposes of this motion. Thus, that element has been satisfied.

### 1. Qualified to Perform Essential Functions

"The determination of whether an individual is qualified for purposes of the ADA is a two-step process, and should be made as of the time of the employment decision." E.E.O.C. v. Wal-Mart Stores, Inc., 477 F.3d 561, 568 (8th Cir. 2007) (citation and internal quotation marks omitted). The first question, then, is whether Minnihan "possesses the requisite skills, education, certification or experience necessary for the job," and the second is whether Minnihan "can,

---

[4] Whether Iowa courts will continue looking to federal law for guidance in interpreting ICRA disability discrimination claims in all instances following the 2008 amendment to the ADA, which expands the definition of disability, see 42 U.S.C. § 12102, is currently before the Iowa Supreme Court, see Goodpaster v. Schwan's Home Serv., No. 13-0010 (Iowa Sup. Ct.). The parties agree to the Court's application of the ADAAA standard for both the ADAAA and the ICRA claims, as possible distinctions now at issue in Goodpaster do not appear applicable herein.

despite [his] impairments, perform the essential functions of the job either with or without reasonable accommodation." Id. (alteration in original).

The parties do not dispute that Minnihan was qualified for the TOS position under the first part of the test, as he had been working as a TOS for years without concern. The second part of the test, the essential functions analysis, is the issue the parties dispute. Essential functions are defined as "the fundamental job duties of the employment position the individual with a disability holds or desires. The term essential functions does not include the marginal functions of the position." Id. (citation and internal quotation marks omitted). "While the plaintiff bears the burden of ultimately proving that he is qualified, an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions." Id. (citation and internal quotation marks omitted).

> "[I]f the employee cannot perform the essential functions of the job *without* an accommodation, he must only make a facial showing that a reasonable accommodation is *possible* . . . . [O]nce the plaintiff makes a facial showing that reasonable accommodation is possible, the burden of *production* shifts to the employer to show that it is unable to accommodate the employee. If the employer demonstrates that the plaintiff is unable to perform the essential functions of the job even with reasonable accommodation, the plaintiff must then rebut that showing with evidence of his individual capabilities. Thus, the plaintiff's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination.

Id. (internal citations and quotations omitted).

> Evidence to consider in this determination may include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 914 (8th Cir. 2013) (citation and internal quotation marks omitted). "The employer's judgment about an essential job function is considered highly probative." Id. (citation and internal quotation marks omitted); see also Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 786 (8th Cir. 2004) ("Essential functions of

the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" (quoting <u>Alexander v. Northland Inn</u>, 321 F.3d 723, 727 (8th Cir. 2003))). "Eighth Circuit cases generally give deference to the employer's judgment of essential job functions, especially when staffing is problematic." <u>Kammueller</u>, 383 F.3d at 786. However, the employer's judgment is merely evidence – it is not conclusive. <u>Id.</u> "Finally, whether a plaintiff is qualified is measured at the time of the adverse employment action, even if the plaintiff is likely to recover in a relatively short period of time." <u>Duello v. Buchanan Cnty. Bd. of Supervisors</u>, 628 F.3d 968, 972 (8th Cir. 2010).

### a. Employer's Judgment

Adreon, Mills, and Cundy testified that driving is necessary to do the TOS job. Adreon was Minnihan's direct supervisor, and Cundy was Adreon's direct supervisor. Cundy testified in his deposition that a TOS needed to be able to drive so they could be out in the field at a moment's notice. Mediacom routinely checked Minnihan's driving records while he worked as a TOS. Cundy testified that Mediacom's goal was to have individuals in the TOS position out in the field 75% of the time. Adreon testified that the TOS "is the first line of anything that needs to be done in the field. The technician would contact the supervisor for any issues throughout the day . . . ." Adreon Dep. 26:1-26:4, Def.'s App. 31, ECF No. 15-8. With the exception of Minnihan, Mediacom has never exempted a TOS from the function of driving for more than a few weeks. Mediacom admits for purposes of summary judgment that before and after his restriction, Minnihan spent half of his work week – approximately twenty hours – in the office performing various administrative and supervisory tasks.

Mediacom did not just expect individuals in the TOS position to be able to drive; they also provided those individuals with a Mediacom vehicle, as TOS individuals were expected to be in the field for 50% of the time, if not more, as well as be able to assist with outages after work

hours.  Minnihan's superiors testified that they expected those in the TOS position to spend a great deal of time in the field to support and supervise assigned technicians, and they therefore assert that driving is an essential function of the TOS position.  This factor weighs in favor of finding driving to be an essential function of the TOS position.

### b.  Job Description

The TOS job description and requirements are set forth in the fact section above.  Several of the specific requirements set forth in that document can only be performed onsite at customer homes, and the description also states that a valid driver's license is required for anyone in that position.  Although "driving" is not listed as a specific task that all TOS individuals must do, it is certainly considered essential in the job description, as drafted.  This factor weighs in favor of finding driving to be an essential function of the TOS position.

### c.  Time Spent Performing Function

It is unclear how much time the average TOS individual spends driving, but Minnihan states in his Resistance brief that he spent approximately 50% of his time in the field in order to supervise and support his technicians.  Cundy expected TOS individuals to spend closer to 75% of their time in the field.  Regardless of which number is used, it is apparent that being in the field to supervise and support technicians required a great deal of time for individuals in the TOS position.  In order to get from the office to customers' homes, cable outages, or other similar locations to complete job duties, Minnihan either needed to drive himself or find someone to drive him.  This factor weighs in favor of finding driving to be an essential function of the TOS position.

### d.  Consequences of Not Performing Function

Mediacom allowed Minnihan to continue working in the TOS position while his driver's license was restricted, and that experience highlights the consequences of Minnihan not

performing the alleged essential function of driving for several months. Hutchison and Adreon testified at their depositions that they and other employees had to work extra hours in order to take on Minnihan's driving-related duties. Although Mediacom has not quantified the cost it incurred during the months Minnihan was restricted from driving, it has presented evidence that employees worked overtime hours due to the extra time they had to work to complete Minnihan's duties as well as their own.

### e.   Current Work Experience of Other TOS Individuals

The record does not contain evidence about what other TOS individuals actually experienced, though it does contain statements by Cundy and Adreon about what was expected of individuals in that position, which included the ability to drive.

### f.   Analysis

Driving is not listed on Mediacom's written TOS job description. However, while an employer's job description is evidence to consider in determining whether a duty is an essential function, neither the inclusion nor the exclusion of a duty in a written job description is dispositive. See, e.g., Dropinski v. Douglas Cnty, Neb., 298 F.3d 704, 708-09 (8th Cir. 2002) (finding that although certain actions were not listed explicitly in the job description, they were inherently required to perform written job functions). In Rehrs v. Iams Co., 486 F.3d 353, 357 (8th Cir. 2007), the plaintiff, who worked for the defendant employer as a warehouse technician, suffered a heart attack and could no longer perform shift rotation. The issue before the court was whether shift rotation, as opposed to straight shift, was an essential function of the plaintiff's job. Id. The employer presented undisputed evidence showing that the employer's multiple other production facilities employed shift rotation; the employer implemented shift rotation and eliminated straight shifts two years prior to the plaintiff's heart attack; the plaintiff had performed shift rotation for two years before suffering the heart attack; and the employer's reasons for implementing shift rotation were because it increased productivity and exposed

18

employees to management, training, and career development opportunities.  Id.  The employer argued that not implementing shift rotation for all warehouse technicians and/or allowing one employee to work a straight shift would undermine both production and the team concept.  Id.

The court rejected the plaintiff's assertion that because the warehouse operated on a straight shift before, the facility shift rotation was not an essential function of the warehouse technician position.  Id.  The court discussed the fact that "[a]llowing [the plaintiff] to work a straight day-shift schedule would have placed a heavier or unfavorable burden on other technicians at the facility."  Id.  In rejecting the plaintiff's assertion that warehouse technicians performed duties during their shifts, whereas rotating shifts were not "performed," and therefore were not an essential function, the court reasoned that "the term essential function encompasses more than core job requirements; indeed, it also may include scheduling flexibility."  Id. at 358.  The court concluded that "shift rotation in the [employer]'s work culture [wa]s an essential function of working as a warehouse technician," id. at 357, and that it was "not the province of the court to question the legitimate operation of a production facility or determine what is the most productive or efficient shift schedule for a facility," id. at 358.   Similarly, in the present case, driving not having been delineated in the TOS job description does not undermine Mediacom's assertion that it was an essential function of the TOS position.  Just as an "essential function" encompassed scheduling flexibility in Rehrs, it encompasses the ability to drive in this case.

In Rehrs, the court found that the shift rotation was an essential function, in large part because the company believed it was necessary for reasons associated with employee efficiency and other intangible benefits for employees.  Similarly, the ability to drive in the TOS position is valuable to Mediacom because it ensures individuals in that position are able to independently satisfy numerous job responsibilities in the field without depending on another employee to physically drive them to a customer's home or outage site.  We can look at the inherent

requirements of a job, based on the explicit responsibilities, to determine whether something is an essential function.  See Dropinski, 298 F.3d at 708 (noting that "[m]any of the functions included in the written job description inherently include the possibility of physical exertion that exceeds [the plaintiff]'s limitations," even if the lifting requirements were not specifically listed in the description).

Additionally, Minnihan's "specific personal experience is of no consequence in the essential functions equation.  Instead, it is the written job description, the employer's judgment, and the experience and expectations of all [TOS's] generally which establish the essential functions of the job."  Id. at 709; see also Knutson, 711 F.3d at 915 ("[The plaintiff]'s specific personal experience is of no consequence in the essential functions equation." (citation and internal quotation marks omitted)).

In Alexander v. Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003), the job description included vacuuming as an essential function, every supervisor at the hotel testified that vacuuming was essential for housekeeping, and even the plaintiff admitted that she occasionally vacuumed.  The Eighth Circuit thus agreed with the district court that vacuuming was an essential function of the housekeeping supervisor position.  Id.  Driving was an essential function of the TOS job.  It is undisputed that Minnihan was provided with a Mediacom vehicle and frequently drove to fulfill his job duties before his driving restriction was in place.

Although Mediacom temporarily accommodated Minnihan in the TOS position during Minnihan's initial driving restriction period, this accommodation does not mean that driving is not an essential function of that position.  "[A]n employer does not concede that a job function is non-essential simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous."  Rehrs, 486 F.3d at 358 (citation and internal quotation marks omitted).  "To find otherwise would unacceptably punish employers from doing more than

the ADA requires, and might discourage such an undertaking on the part of employers." Id. (citation and internal quotation marks omitted); see also Phelps v. Optima Health, Inc., 251 F.3d 21, 25-26 (1st Cir. 2001) (agreeing with other courts that have addressed the issue "that – even when an employer and employee have made arrangements to account for the employee's disability – a court must evaluate the essential functions of the job without considering the effect of the special arrangements" (citing Basith v. Cook Cnty., 241 F.3d 919, 930 (7th Cir. 2001); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175-76 (10th Cir. 1999); Miller v. Ill. Dep't of Corrs., 107 F.3d 483, 485 (7th Cir. 1997); Pickering v. City of Atlanta, 75 F. Supp. 2d 1374, 1378-79 (N.D. Ga. 1999)).

"[E]vidence that accommodations were made so that an employee could avoid a particular task merely 'shows the job could be restructured, not that [the function] was non-essential." Phelps, 251 F.3d at 26 (second alteration in original) (citation and internal quotation marks omitted). To rule otherwise would discourage employers from making such undertakings. Id. (citing Laurin v. Providence Hosp., 150 F.3d 52, 60 (1st Cir. 1998) ("From a labor-management policy standpoint, it would be perverse to *discourage* employers from accommodating employees with a temporary breathing space during which to seek another position with the employer. . . . An employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous.")). Although Mediacom provided a temporary accommodation to allow Minnihan to continue working in his TOS position while he was unable to drive, this temporary accommodation is irrelevant to this Court's determination as to the essential function of the TOS position, as analyzed above.

Based on the record before this Court, Minnihan has failed to show that he was a "qualified individual" for purposes of the ADAAA and ICRA. The ability to perform certain

tasks or physical functions, while not always delineated in the job description, can, nonetheless, be essential functions of the job. See, e.g., Alexander, 321 F.3d at 728 (finding that because the employer hotel required its housekeeping supervisors to be working supervisors and to be able, when necessary, to perform the cleaning tasks of the housekeepers they supervised, which included vacuuming various rooms in the hotel, "vacuuming was an essential function for all Northland housekeeping supervisors"); Dropinski, 298 F.3d at 709 (holding because plaintiff's AEO II position duties and abilities included operating tandem axle dump trucks, operating snow removal and other heavy equipment, performing tasks incidental to equipment operation, assisting with equipment maintenance and repairs, the ability to lift up to 100 pounds, physical strength, and the ability to perform manual labor outside, "it is apparent that [the plaintiff] is unable to perform the essential functions of the AEO II position given the bending, twisting, squatting, and lifting restrictions proscribed by his doctor").

Here, Mediacom provided Minnihan with a vehicle, expected him to spend 50 to 75% of his workweek in the field, set forth specific responsibilities in the job description that necessitated Minnihan working in the field, and provided corroborating evidence through deposition testimony and documentary materials that everyone in the TOS position was expected to drive and could not fully execute the duties of the TOS position without being able to drive. Minnihan's assertion of how the job can be restructured to ensure the job responsibilities are completed by someone at the Ames hub are not relevant to this Court's inquiry under the test set forth by the Eighth Circuit for determining whether something is an essential function. Because driving was an essential function of Minnihan's TOS position and it is undisputed that Minnihan could not drive, Minnihan has not demonstrated that he could perform the essential functions of his position and therefore cannot show a prima facie case of disability discrimination.

### 2.   Adverse Action Due to a Disability

Mediacom next argues that even if the Court were to find that driving was not an essential function of the TOS position, Minnihan failed to show that he suffered an adverse employment action due to disability.  Minnihan was terminated from the NOC Operator position because Minnihan failed to report to work after being transferred to the NOC Operator position in Des Moines.  As stated by the Eighth Circuit, "a transfer from one job to another is not an adverse employment action if it involves only minor changes in the employee's working conditions with no reduction in pay or benefits."  Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 716 (8th Cir. 2003) (citation and internal quotation marks omitted); see also Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997) ("A transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action . . . .") (citation and internal quotation marks omitted).  Minnihan contends that his transfer to the NOC Operator position was done solely because of Minnihan's seizure and resulting inability to drive, and that the transfer constituted more than a minor inconvenience due to the commute from Ames to Des Moines.[5]

The Eighth Circuit has held that, in employment cases, there is a "clear trend of authority . . . to hold that a *purely* lateral transfer, that is a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action."  Jones v. Fitzgerald, 285 F.3d 705, 714 (8th Cir. 2002) (quoting Ledergerber, 122 F.3d at 1144).  Minnihan's transfer to the NOC Operator position was not an adverse employment action.  The transfer involved minor changes to Minnihan's working conditions, and there was no reduction in his pay or benefits from his TOS position.  Although Minnihan would be required to commute

---

[5] It is undisputed that there were no open positions at the Ames facility at the time Minnihan was transferred to the NOC Operator position in Des Moines.

from Ames to Des Moines,[6] this was not an adverse employment action, as he was assured his new supervisor would be flexible with him regarding his commuting needs, and his pay and benefits were staying the same as they had been in the TOS position.  See Griffin v. Potter, 356 F.3d 824, 830 (7th Cir. 2004) (holding that an increased commute due to a job transfer is not an adverse employment action, as it does not involve a material change in duties or benefits); Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998) (finding that a transfer that required an increased commute from between 5 and 7 minutes to between 30 and 40 minutes was not an adverse employment action, as the plaintiff's salary and benefits remained the same); Pearson v. Indep. Sch. Dist. No. 2142, No. 00-779 PAM/JGL, 2001 WL 1640071, at *7 (D. Minn. Aug. 22, 2001) (holding that incurring a financial loss as a result of a job transfer because a commute became longer is not an adverse employment action prohibited by Title VII).

While Minnihan's unfortunate condition compelled lifestyle changes for a longtime valued employee, there is no genuine issue of material fact in the record that precludes the required legal conclusions.  Minnihan could not drive, which was an essential function of his TOS position.  In addition, Minnihan's transfer to the NOC position in Des Moines did not constitute an adverse action under the applicable law.  Having failed to prove these elements, Minnihan has not presented a prima facie case of disability discrimination under the ADAAA and the ICRA, making summary judgment appropriate.

### C.  Failure to Accommodate: ADAAA and ICRA

If Minnihan was able to present a prima facie showing of disability discrimination, the burden would shift to Mediacom to show that it is unable to accommodate Minnihan's disability. See Brannon v. Luco Mop Co., 521 F.3d 843, 848 (8th Cir. 2008) ("Under the modified burden-

---

[6] The Court takes judicial notice that the Mediacom facility at 225 S. Dayton Ave, Ames, Iowa 50010, is approximately 33 minutes or 34.2 miles away from the Mediacom facility at 2205 Ingersoll Avenue, Des Moines, Iowa 50312.  See Google Maps, https://maps.google.com (enter addresses) (last visited Dec. 9, 2013).

shifting approach, the employee must first make a facial showing that he has an ADA disability and that he has suffered [an] adverse employment action.  Then he must make a facial showing that he is a 'qualified individual'" as set forth in the ADA prima facie case test set forth above. Once the employee is able to make a facial showing that a reasonable accommodation is possible, "the burden then shifts to the employer to show that it is unable to accommodate the employee." (alteration in original) (citation and internal quotation marks omitted)).

"To determine the appropriate reasonable accommodation it may be *necessary* for the [employer] to initiate an informal, interactive process with the [employee] with a disability in need of the accommodation." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999) (alteration in original) (citation and internal quotation marks omitted).  "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Id. (citation and internal quotation marks omitted).  "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer *must* make a reasonable effort to determine the appropriate accommodation.  The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." Id. (quoting 29 C.F.R. § 1630, App. § 1630.9).

The Eighth Circuit has stated that, at the summary judgment stage, "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1021 (8th Cir. 2000) (citation and internal quotation marks omitted).  If the court comes to this conclusion, "a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA." Id. (citation and internal quotation marks omitted).

"To establish that an employer failed to participate in an interactive process, a disabled employee must show:  (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith."  Id. at 1021. Mediacom does not contest that it knew about Minnihan's disability, and there is no dispute that Minnihan asked for some type of accommodation due to his driving restriction.  Thus, the only two issues to analyze regarding Mediacom's participation in an interactive process are whether Mediacom acted in good faith and whether Minnihan could have been reasonably accommodated but for Mediacom's lack of good faith.  The record facts for this analysis are not in material dispute.

If an employee is unable to perform essential functions of his current job, the only reasonable accommodation is to reassign that individual to another position within the company.  See Cravens, 214 F.3d at 1017.  However, "the very prospect of reassignment does not even arise unless 'accommodation within the individual's current position would pose an undue hardship.'" Id. at 1019 (citation and internal quotation marks omitted).  "In this sense, reassignment is an accommodation of last resort."  Id.  Further, the reassignment position must be an existing, vacant position at the company; "the employer is not required to create a new position as an accommodation."  Id.  Additionally, "the employer is not obligated to provide the accommodation requested or preferred by the employee; the reassignment need only be a 'reasonable' accommodation."  Id.

If an accommodation in Minnihan's TOS position was unreasonable or otherwise posed an undue hardship to Mediacom, and therefore a transfer to a different position was the only reasonable accommodation available, Minnihan "must offer evidence showing both that the position offered was inferior to [his] former job and that a comparable position for which the

employee was qualified, was open," to prove he did not receive a reasonable accommodation. Rehrs, 486 F.3d at 359 (citation and internal quotation marks omitted) (alterations in original). Minnihan cannot meet this burden as he has failed to provide any evidence that the NOC Operator position was inferior to his TOS position – aside from the travel issues he experienced – and he has not provided any evidence that there was a comparable position to the TOS job that was open either in Ames or any other Mediacom office.

Mediacom argues that assigning essential duties of the TOS position to other individuals at the Ames office was an undue hardship, and although they incurred this burden for 10 months while Minnihan was temporarily restricted from driving, Mediacom asserts they should not be required to continue providing him with this accommodation going forward.  Further, Mediacom contends that the undue hardship issue is not material in light of the analysis in the essential functions discussion above.

Minnihan argues that Mediacom has failed to demonstrate the financial and business impact of his proposed accommodations – wherein he would stay at the Ames office and continue in his modified TOS position – so Mediacom has failed to prove undue hardship.  Hutchison spent any-where from a few hours a week to one Saturday a month catching up on his regular work since he had to drive Minnihan around.  Minnihan argues that one hour per week, on average, seems rather minor in comparison to getting rid of a long-time, experienced technician.

"The [ADA] does not require affirmative action in favor of individuals with disabilities.  It merely prohibits employment discrimination against qualified individuals with disabilities, no more and no less."  Rehrs, 486 F.3d at 358 (citation and internal quotation marks omitted) (alteration in original).  "Under the ADA, an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated."  Id. at 357.

"It is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform."  Alexander, 321 F.3d at 728;

see also Knutson, 711 F.3d at 916 ("Moreover, the employer is not required to reassign existing workers to assist [the employee] in his essential duties." (alteration in original) (citation and internal quotation marks omitted)); Dropinski, 298 F.3d at 707 ("While job restructuring is a possible accommodation under the ADA, this court has held that an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." (citation and internal quotation marks omitted)). "Restructuring frequently involves reallocating the marginal functions of a job, [but] an employer is not required to reallocate the essential functions of a job." Dropinski, 298 F.3d at 709-10 (citation and internal quotation marks omitted) (alterations in original). Stated differently, it is an *unreasonable* accommodation to require an employer to eliminate the essential functions of an employee's position. Knutson, 711 F.3d at 916 ("Eliminating the essential job function of being DOT qualified would be an unreasonable accommodation."). "As the EEOC notes, a disabled individual is not entitled to an accommodation of his choice." Rehrs, 486 F.3d at 359.

Driving is an essential function of the TOS position, and Minnihan was unable to perform this function at the time of his transfer to the NOC Operator position and later termination. Mediacom is not required under the ADAAA to provide Minnihan with an unreasonable accommodation, and as set forth by the Eighth Circuit, eliminating the essential functions of the job or reallocating those functions to other employees is an unreasonable accommodation. Although Minnihan may believe driving is not an essential function of the TOS position because he did not drive while he was restricted from doing so, Mediacom is not bound to continue with this accommodation on a long-term or permanent basis because it was an unreasonable accommodation. See id. at 358 ("[A]n employer does not concede that a job function is non-essential simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous." (citation and internal quotation marks omitted)). Minnihan's suggestions to

Mediacom in his letters only included the reallocation of his duties to other individuals; he has not provided this Court or Mediacom with an alternative to the NOC Operator transfer that constitutes a reasonable accommodation.

Although Mediacom has not set forth the cost-benefit analysis regarding the consequences of keeping Minnihan in the TOS position, they have presented evidence demonstrating that the only way they could accommodate Minnihan in his TOS position, with all of his suggestions taken into consideration, was to reallocate the essential functions of his job to other employees at the Ames office.  This is an unreasonable accommodation.  Thus, the "last resort" option of transferring Minnihan to a comparable position in the company meets the requirements of the law.

The only accommodation Minnihan suggested that was not provided by Mediacom involved restructuring his position to eliminate his driving responsibilities.  He asked in a letter on July 25, 2010, whether his TOS position could "be restructured to include non-driving activities like working in the Ames Hub."  Pl.'s App. 179; ECF No. 19-1, p. 20.  Again on April 29, 2011, Minnihan mentioned in a letter that "[a]nother possibility would be to restructure the TOS position in Ames."  Def.'s App. 161; ECF No. 19-1, p. 20.  Although Mediacom may not have discussed Minnihan's suggestions with him, his suggestions were an unreasonable accommodation that Mediacom did not have to accept under the ADAAA.  Even if Mediacom had discussed these options with Minnihan as he requested, it would not have changed the fact that he was requesting something Mediacom was not required by law to provide, as he was suggesting only unreasonable accommodations.  Thus, Minnihan has not demonstrated that Mediacom failed to engage in the interactive process in good faith to provide him with a reasonable accommodation, making summary judgment appropriate.

IV.   **CONCLUSION**[7]

Mediacom's Motion for Summary Judgment (ECF No. 15) must be **granted**.  The above-titled action is therefore dismissed.

**IT IS SO ORDERED.**

Dated this 19th day of December, 2013.

JAMES E. GRITZNER, Chief Judge
U.S. DISTRICT COURT

---

[7] Both parties concede that the "direct threat" argument raised by Mediacom in its Reply is not material to the present motion nor properly raised as an argument in the Reply; the Court therefore will not decide whether Minnihan posed a direct threat at the time he was terminated by Mediacom.